**JOSEPH T. RYERSON, Inc., v. HARLEY DAVIDSON MOTOR CO.**

District Court, E. D. Wisconsin.
March 4, 1931.

Bloodgood, Kemper & Bloodgood, of Milwaukee, Wis., and Paul, Paul & Moore, of Minneapolis, Minn., for plaintiff.

Max W. Nohl, S. L. Wheeler and L. C. Wheeler, all of Milwaukee, Wis., for defendant.

GEIGER, District Judge.

The plaintiff, as holder of Conradson patent, No. 1,140,299, sues for infringement. That patent, applied for March 30, 1914, and issued May 18, 1915, pertains to an "automatic spindle lathe." The mechanism, either upon or outside of the patent descriptions, is quite difficult to describe with fair conciseness in an opinion. The defendant is using a machine purchased from a maker holding a number of patents issued to Bullard and Stevens; and except upon certain contentions respecting the infringing aspects of the defendant's machine, the case involves Conradson and Bullard and Stevens patents as conflicting patents. The particular Bullard and Stevens patent whose construction is involved in this case was applied for shortly before Conradson, and issued about three years later. It is stipulated, however, that the defendant's machine is an embodiment of a later patent to Bullard and Stevens, granted in 1920, which, so the patentee states, covers automatic multiple spindle machine tools, "in general  *   *   * styled after and is an improvement upon my former multiple spindle machine for which letters patent of the United States Number 1,258,089 were granted March 5, 1918." So if, upon the conflict between the Conradson and the earlier Bullard patent, it appears that the defendant's machine exemplifies, not only the latter, but also as to the claims in issue, the earlier Bullard patent, the case is made out.

It may be said at the outset that upon mere comparison of the Conradson and the earlier Bullard patent, their relative claims in question here appear clearly to be conflicting; and, as will be seen, it is impossible to escape a finding that such claims with slight changes in language as to certain elements, not only on their face, but upon the proofs dealing with the development of the Conradson structure and his work in developing the situation for patent application, appear to have been copied in Bullard from Conradson.

It is believed that instead of a detailed description of the structure shown in the patents, or in use by the defendant, it may suffice, except so far as detail may be necessary in the consideration of either validity, scope, or the infringing character of the defendant's machine, to treat the subject by assuming that the parties, first of all, appreciate fully what there is, basically, in common between the conflicting patents and the defendant's machine. If, therefore, the matter is approached upon consideration of the claims and the concessions which the parties make respecting their identity, leaving for determination the narrower issue, whether the differences in language or in structure, as those differences are asserted in connection with those claims are real and substantial, the court will have considered and disposed of the issues as the parties have really litigated them. This will be entirely consistent with a broad concession that the structures of the respective parties may not be comparable in appearance, may be widely variant in detail, perfection, and efficiency of mechanical organization; and it is likewise consistent with the thought that, with such variation, any or all of the elements comprised within any claim are, separately, old in the art, and yet the particular combinations covered by the claims in question may be broadly novel and found in the alleged infringing structure.

An attempt will therefore be made to consider the case upon direct approach to the claims asserted by the plaintiff, and, in view of the stipulation respecting defendant's machine, to consider, first, the claims of the Bullard patent, which, as noted, appear to be either an entire, or, as the defendant claims, only a partial, copy of Conradson. If, as to some of such claims, complete identity appears, then the only question remaining may be whether the defendant's machine is within such identical claims. This attempt may be further premised upon general observations respecting the commencement and prosecution of Conradson's work. That he commenced his work in the year 1912, long before anything was done by the rival patentees, that thenceforward until the date of filing his patent, he prosecuted his work diligently, with the result that late in 1914, so the testimony shows, he had completed, or practically completed, a machine—"90% complete," so the witnesses state—is not open to doubt. That he diligently prosecuted the work of preparing for application for patent is likewise free from doubt. This general situation is of importance in view of the complexity of the structure and the mass of detail requiring attention, not only in the building and organizing of the machine, but the accurate development of drawings, descriptions, and the like, incident either to construction of a machine or to patent application; and it is particularly relevant, as against the defendant or its manufacturer, in respect of the claims in question which, as will be seen, were in general form and substance prepared and filed by Conradson with his patent application, and, with amendments, allowed, before they appeared in copending patent application of Bullard and Stevens.

So, too, in the consideration of each of the several conflicting claims, it may and should be quite conclusively presumed that, as between the conflicting patents, identity of description of elements means,

1. Structural identity in fact, at least within the conception of the rival applicants.

2. That, respecting an element stated in variant language, there is a strong presumption that Bullard's statement covering such element was made for the purpose of evading or avoiding a corresponding element of Conradson then clearly in the mind of Bullard.

■ It is believed conducive to brevity, perhaps to clarity, if these "conflicting" claims be considered in parallel. We come first to claim 1 of Conradson's patent, and claim 64 of Bullard patent, No. 1,258,089:

| Conradson | Bullard |
|---|---|
| Claim 1. | Claim 64: |
| In a multiple spindle lathe, | In a multiple spindle machine, |
| (1) a revolving carrier having a step by step movement, | (1) a revolving carrier having a step by step, movement, |
| (2) a plurality of revolving driving spindles having a stationary support, | (2) a plurality of revolving driving spindles having a stationary support, |
| (3) a plurality of work-holding spindles mounted in said carrier to revolve therewith and encircling said driving spindles and geared thereto to be revolved thereby, | (3) a plurality of work-holding spindles mounted in said carrier to revolve therewith and encircling said driving spindles and geared thereto to be revolved thereby, |
| (4) means for operating said spindles at variable speeds, and | (4) means for operating said spindles at variable speeds, and |
| (5) a tool carrier having a reciprocating movement toward and from said work-holding spindles, and | (5) a tool carrying means having a reciprocating movement toward and from said work-holding spindles. |
| (6) tool holders mounted in said tool carrier to register respectively with said work-holding spindles. | |

Now, with literal identity in the statement of the first four elements, the query at once arises whether upon comparison of the fifth and sixth of Conradson with the fifth of Bullard, any substantive definitive difference can be discerned between them; that is, whether the variant language even suggests any structural or mechanical difference. And of course this does not mean whether those who may be able to read the claims and understand the elements would make the same picture of the structure, or produce mechanical organizations disclosing exact identities in all particulars. Thus, if the combination of the first four elements were all that is involved in the case, and unless each element of the combination were entirely new—a thing that rarely happens—then upon the general language used to designate elements it may well be assumed that any one of known elements, or a new element or its *then* unknown equivalents, was comprehended. And in the presentation and discussion of this case there has been no suggestion respecting any alternative of reading and interpreting the literal identity of these claims so far as the first four elements are concerned. It is of interest because, both on comparison of the patents and on examination of the defendant's machine, widely variant but admitted mechanical equivalences in the respective elements are present. True, on the issue of infringement, some contention is made respecting correspondence of Bullard, either in his patents or in defendant's machine with what are termed "characteristics" of Conradson; yet, on oral argument the concession was made that the main defense was noninfringement; that issues such as validity and priority became important only if the claims in question should be regarded as disclosing a "primary or so-called pioneer invention, and entitled to a real wide range of equivalents"; and in a brief on a question of "priority" said to arise between Conradson and Bullard, it is said: "The question of priority is not raised for the purpose of asserting any prior invention dominating the Conradson structure. This *would not be possible* in view of the prior art."

Now when, for his fifth element, Conradson specified a "tool carrier," and Bullard, a "tool carrying means," each in other respects with the (apparently identical) structural and functional qualities of "a reciprocating movement toward and from the work-holding spindles"; the query is not whether structural differences are suggested by variant words, "tool carrier" and "tool carrying

means," but rather the query whether, upon any basis, either may be discriminated as merely *equal* and also of great, breadth—from the other. The substance of it is that the structural concept of each is definable in the terms used by the other; that is, the "tool carrier" of Conradson is a "carrying means" for a tool or tools; and the "tool-carrying means" of Bullard is a "carrier" of, or for, a "tool," or, *tools*. Neither has, expressly or implicitly, the idea of a single tool to be carried; both inherently deal in a multiple structure; and neither, in or by the language used—or indeed upon the art —shows a purpose *by these claims*, to include only a carrier or means having integrality, and to exclude one having divisibility; or to include only the latter, and to exclude the former. Now, with this identity of definition, the contention made on behalf of the defendant and the conflicting patents of Bullard is not to be resolved upon a showing—which may be conceded—that in the development of the latter greater perfection of operability has been attained. And this idea must be excluded if it can be accepted as a fact that such perfection has none the less been attained within the limits of the structural combination as defined in the conflicting claims. It would be paradoxical to admit the definitive applicability of the claims to the structure, with its variant, and yet deny applicability because of the variant—to say that identity of definition of a combination was used to disclose differentiation. These observations are deemed vital in testing out the contentions put forth by defendant to relieve against the scope claimed on behalf of plaintiff—of course, to meet the charge of infringement. And by way of elaboration of what has just been referred to as a paradox, the query at once arises why Bullard, in his patents and in defendant's machine, should import the identical broad concept of Conradson, if, as is now asserted, the latter, as to the claim now considered, has a "characteristic" to be avoided or evaded, and, as now insisted, it should be held that it has been done successfully. The same, though more particular statement of the query is: Why should Bullard, if he sought differentiation or limitation of concept, and if, as he now says, in substance, his patents and machine (defendant's) had that differentiation or limitation, yet import into his patent the concept from whose definition (Conradson's) he desired to differentiate his own?

This brings us to a consideration of the defendant's contention respecting the struc-

tural differences; and, for present purposes, there is no need of detailed recitation of specifications of this complicated structure. On reference to the drawings, the narrow differences, upon legal aspect, will appear. The substance is:

Conradson provides a central column (see No. 41) in Fig. 1 of the patent around which is placed a six-sided structure (see No. 130 in Figs. 1 and 4) and against and secured upon the faces of this are placed blocks, serving as holders for tools. There are six work-holding spindles (see No. 57, Fig. 4) with which the tool-holders (see No. 133, Fig. 4) register for, as defendant puts it, "simultaneous performance or operation of the tools upon the work at the various stations."

Of this, and the claimed differentiations of defendant's machine, it is said by counsel:

"This *common* tool carrier for *all* tool carriers and all tools with no relative movement between *any one* tool holder and *any other* tool holder or tool is an *outstanding characteristic of the Conradson machine.* [The defendant's machine simply does not have any such characteristic. It has a fixed central column with six sides or faces at its upper portion and on five of these faces separate, individual independent *tool carriers are* mounted to slide up and down *as distinct units.*]

"The Conradson *common tool carrier* with all of its fixedly related tool holders and tools is moved as a unit up and down by *one device* the piston 126 in the inelastic fluid cylinder 121" (see Fig. 5) (Italics and brackets supplied).

Again: "The five individual tool carriers of defendant's machine, each by its *own* exclusive drivers, towit, the separate rack rods connected to respective saddles of the tool heads and coacting with the respective cam drums, each of which has its own train of operating gears and its own fast and slow motion clutches and control devices."

Much is said respecting the Conradson machine because of its asserted embodiment of a "single unit" idea which in the light of experience—and possibly the perfection of what may be called Bullard's "divided tool" idea—demonstrates the commercial limitations of the former. But as has been noted, when once the definitive scope of Conradson's claims is recognized, when, further, it must be recognized that neither the art, the specifications, nor the claims, call for limitation, then to assert that greater elaboration of the concept takes the structure beyond infringing range, begs the question at issue. To what extent Conradson's machine as described in his patent, or Bullard's as described in any of his, and the defendant's machine as an embodiment of Bullard's patents, may *at this time* be real rivals in the manufacturing world, strikes me as no basis for considering whether Conradson's patent should be cut down or otherwise limited in its broad language. The position of the defense, if accepted to the full, amounts in substance to this: (1) That the defendant's machine discloses an elaboration—perhaps a perfection—making it preferable because of greater operative scope and flexibility; (2) that Conradson, by failing to disclose and claim the degree of variation and elaboration of his broad concept, should be held to have limited it. The entire argument seems effective only to the issue whether credit is due to Bullard for greater refinement of application of Conradson's idea. And this is particularly true in view of the entirely adequate showing of the operability and use of the Conradson machine in extensive manufacturing, down to the trial of this case, though it may not, as such, be a powerful rival of Bullard's in view of what may be conceded to the latter. But the point is that Bullard as an improver, and as an express adopter of Conradson's claims, should not be heard to say that they were adopted and incorporated for purposes of refinement but not for infringement. In the absence of a defense of invalidity—upon the art—and on the concession of validity, he cannot be heard to qualify his adoption with an undisclosed reservation that his adoption should not be construed as a tribute to Conradson, either as to validity or scope; that he adopted what is called an integral tool carrier solely to add to it a refinement of divisibility.

A further contention upon this claim deals with the element, "means for operating said spindles at variable speeds." It may be observed, regardless of the mechanisms employed, that if Conradson's conception calls for such an element, Bullard's and the defendant's machine are *in equal if not greater need of it;* and that such need must be supplied in some way, and by some sort of, mechanical expedient. And not only prima facie, but rather conclusively, the importation of this element by Bullard demonstrates his recognition of this need, at least to the extent that Conradson incorporated it; that is, a need to be somehow, and to some degree, provided for. That Bullard,

as the manufacturer of defendant's machine, further expressly recognized, claimed, and claims, to accomplish this object, cannot be controverted upon the record. The matter is covered in an Operator's Hand Book, and more particularly in a descriptive circular under the heading "Independent Spindle Speeds": "By means of change gears in the feed works, widely variable, independent selective speeds may be obtained at each work station. The meshing of the pinion at each station with the spindle drive gears as they are presented at that station provides for the same respective spindle speeds at all times." Again: "Transformer or change gears conveniently located at the head of column provide the means for speed changes."

Now, respecting this element, Conradson placed no restriction upon the means to accomplish variable speed, and it is not suggested that the art imposed any. It is my judgment that though means be quite variant, the art would at once suggest a wide range of equivalences. And there is nothing in the situation to suggest that *the* means for speed variation must at all times reside in and be capable at all times to function as an *integral* part of the structure. So, when it appears, as it does, that the defendant employs "change gears" to take the place of others removed from time to time during operation, instead of having gears in the machine capable of being shifted in or out of operable position, it seems idle to question clear equivalency. The object is identical, the variable speed is accomplished through identical variant means, change gears, and whichever is adopted depends rather clearly upon choice—of equivalents.

Upon these views I am well satisfied respecting the scope of claim 1 of Conradson's patent, and that defendant's machine infringes.

Coming to the next claims, Nos. 2 and 65, respectively, of the two patents, they are:

| Claim 2—Conradson | Claim 65—Bullard |
|---|---|
| In a multiple spindle lathe, | In a multiple spindle machine, |
| (1) a plurality of driving spindles having a stationary support, | (1) a plurality of driving spindles having a stationary support, |
| (2) a revolving work-carrier having a step by step movement around said spindles, | (2) a revolving work-carrier having a step by step movement around said spindles, |
| (3) a plurality of work-holding spindles mounted in said carrier at a uniform distance from the axis thereof and from one another, | (3) a plurality of work-holding spindles mounted in said carrier at a uniform distance from the axis thereof and from one another, |
| (4) said driving spindles having gearing | (4) said driving spindles having gearing |
| whereby one or more of them may be stationary and all the others driven simultaneously, | whereby one or more of them may be stationary and all the others driven simultaneously, |
| (5) said work-carrying spindles being geared to and encircling said driving spindles to be revolved successively thereby only during the stationary or intermediate periods between the steps of said work-carrier, | (5) said work-carrying spindles being geared to and encircling said driving spindles to be revolved successively thereby only during the stationary or intermediate periods between the steps of said work-carrier, |
| (6) the stationary period of each work-carrying spindle, when opposite the stationary driving spindle, permitting the convenient mounting or removal of the work, and | (6) the stationary period of each work-carrying spindle, when opposite the stationary driving spindle, permitting the convenient mounting or removal of the work, and |
| (7) a reciprocating tool carrier having tool holders supported opposite and registering with said work-carrying spindles. | (7) a series of reciprocating slides having cutting tools supported opposite and registering with said work-carrying spindles. |

Here again (except for the designation one, a "lathe," and the other, a "machine") literal identity appears until the seventh element is incorporated, an element which Conradson, as in claim 1, heretofore noted, categorically, and just as comprehensively, characterizes as a "reciprocating tool carrier," whereas Bullard, though adopting the mechanical idea of reciprocation (by something), designates it as a *series* of *slides* (reciprocating), and then adds the subelement, "having cutting tools," but *all*, like Conradson, "supported opposite and registering with said work carrying spindles."

In like manner, the asserted verbal differentiation here calls attention to the implication, viz., that the basic element of "tool carrier" or a "tool carrying means" is in the mind of the draftsman of Bullard's characterization of the element, just as appears in claims 1 and 64. True, there is a translation of a "tool carrying means" of the sixty-fourth claim, into the *"series* of reciprocating slides" of the sixty-fifth, which may effectively describe components or subelements of the "carrier" or the "means"; but, as has been noted, cannot, and does not, withdraw the structure from the broader and more generic definitive concept. On the contrary, the latter is either expressed or is implicit in the very language used by Bullard.

At this point, a differentiation—particularly in defendant's machine—is claimed respecting the fourth element which deals with the gearing mechanism which permits "one or more" of the driving spindles to be *stationary* and all "others driven simultaneously." Bullard's claim, if we are to follow the estimate placed upon identity of language and the conclusive inference to be drawn

upon copying, must therefore be treated as a structure embodying this as an infringing element. Defendant urges that it discloses a characteristic of Conradson's structure which permits any station to be, or to become, a *loading* station, and that the gear arrangement is such that, as may be desired, any one station may be thrown into neutral. It must be conceded that if Conradson is to be so interpreted, Bullard's claim is identical. The contention is that in defendant's machine this "characteristic" is not introduced. That is to say, the clause is made to deal solely with the establishment of one or more *loading stations*. In testing out any such attempted differentiations as affording relief from infringement, the sixth element of claims 2 and 65 of the two patents, has considerable relevancy. It deals with a stationary period of *each* work-carrying spindle *when* opposite the stationary driving spindle, permitting convenient mounting; and it is urged that defendant escapes the terms of the element, or elements, and therefore the claim, by, "once for all, in the building of the machine, omitting the *driving spindle* and *all* gearing, at the (front) station." Bullard's patent specifications show —perhaps more clearly than Conradson, and perhaps in a more highly refined organization—the purpose to create *stationary* periods, and for loading purposes, usually *at the front of the machine*. It is merely another way of stating the purpose, to say that both desired to obtain interruption of operation; but, undeniably, in the patents, and, as will be seen in the defendant's machine, the *scope*, the continuity, the determination of the number, character, duration, or place or places of *stationary periods*, is left open, broadly, to *choice* and *arrangement* of the *gearing* of the spindles. The problem involved the broad concept of providing neutrality. So that if Conradson and Bullard, in their patents, both contemplated creating a stationary or idle work period by a gear arrangement at the front of the machine, because the driving spindle *at that point* must go out of gear, the defendant's machine renders it certain by *omitting* the *particular* driver, and *its* gears at that point. Now, in doing this, has defendant *omitted an element of the claim?* Has it omitted either the fourth or sixth elements, or the structure which their relationship demands to accomplish the purpose of creating, in a *multiple machine,* stationary periods, through gearing? It is my view that here, also, the defendant's machine is clearly within Conradson's concept, merely a variant application of the principle, possibly a cutting down

of the *degree of gearing* which Conradson in his *six*-spindle structure and gearing shows in his drawings. It leaves defendant with the mechanical principle, but with a deliberate application accomplishing the identical purpose with identical means—in the sense of the patent law. This does not necessitate saying that six spindles and five spindles make identical structures. But, rather that, operatively, the five in one machine function in the same manner, upon the same mechanical promptings, to accomplish the same purpose as the six—one of them intermittently neutral *because* of gearing— in the other. I conclude that defendant's machine infringes claim 2.

Claims 3 and 66 are found in Conradson and Bullard, thus:

| Conradson—Claim 3. | Bullard—Claim 66. |
|---|---|
| The combination, with | The combination, with |
| (1) a revolving carrier having an intermittent movement, of | (1) a revolving carrier having an intermittent movement, of |
| (2) a central driving gear, | (2) a central gear drive, |
| (3) a plurality of work-carrying spindles *mounted* in said carrier and having gears thereon, | (3) a plurality of work-carrying spindles mounted in said carrier and having gears thereon, |
| (4) a corresponding number of driving spindles mounted in fixed bearings between said central gear and said work-carrying spindles and having | (4) a number of driving spindles mounted in fixed bearings between said central gear drive, and said work-carrying spindles, and having |
| (5) gears meshing continuously with said central driving gear and intermittently with said work-carrying spindle gears in the revolution of said carrier. | (5) an operative connection continuously with said central drive and intermittently with said work-carrying spindle gears. |

Again, literal identity is found until we come to the fourth and fifth of the respective elements. In the fourth, a sole difference is found in Conradson's use of the qualifier, "corresponding" in respect of "number" of driving spindles; whereas, in the fifth, Bullard discloses "an operative connection" instead of "gears meshing"; both, however, *"continuously* with said central drive, and intermittently with said work carrying spindle *gears."* (Italics supplied.) Now, limiting our present consideration to the face of the claims, it is difficult to understand why the qualifier "corresponding" must be limited to designate *solely* exact *numerical* correspondence and thus to exclude *operative* or *operating* correspondence; that an operative correspondence between six of one with five of another group of spindles was and is entirely beyond the law of Conradson's machine because the latter has the numerical correspondence, al-

beit it provides for breaking down—as may be desired—what may be called continued operative correspondence, that is, correspondence, spindle for spindle, six for six. In other words, in the one, the mechanical law is carried out by compelling intermittent inoperativeness in one way; in the other, in another way. It may be conceded that by removing one spindle and its gears entirely, there can be no question respecting the *neutrality of the removed* spindle. But the *operative and successive correspondence* is also thereby most certainly assured as between the six of the one and the five of the remaining spindles. It seems almost obvious that this kind of correspondence is inherent or basic in the structures of the parties— and in other structures of the art—and there is nothing demanding that the notion of exact, and continuous *numerical* correspondence must dominate or override it and thereby introduce Bullard's or defendant's variation as a nonequivalent, new, element. Although both inventors aimed to bring in a *dead* spindle at a certain point, that is to say, to keep it out, operatively, it can hardly be conceded that Bullard, by *burying* one of his spindles, thereby to insure death at that point, has gone beyond the element, when the identical operative correspondence of the machine's law is retained.

Coming to the asserted differentiation arising upon element 5 of this claim: When Conradson particularizes "gears meshing continuously" with other gears, and Bullard, an *"operative connection"* likewise *"continuously"* with "like" (Conradson's) "work carrying spindle *gears*," it is obvious that both had in mind a gear connection —operative upon the law of *gear meshing* —and nothing else. Whether an examiner of the Patent Office could readily find, in an "operative connection" with a gear, something other than another gear or a series of gears, something other than a *gear meshing* connection, no matter how highly organized and refined, is a conjectural possibility, indulgence in which will not be helpful.

The case, on this element, has brought nothing from the defense, either upon the machine in suit or upon Bullard's patent, except that the "gears meshing" of Conradson are found in Bullard and defendant's machine in a varied form. The latter's "operative connection" indispensably depends upon *gears*, which, sooner or later, directly or serially, mesh, to accomplish the precise continuity and the called for intermittance. And when it appears that nothing has been or can be suggested as a basis for narrow-

ing Conradson to his precise disclosure of meshing gears, there is no basis for considering Bullard's variation, as a transmission means, other than plainly equivalent.

Coming to claims 4 and 67, they are, respectively:

| Conradson—4 | Bullard—67 |
|---|---|
| The combination with | The combination with |
| (1) a revolving carrier having an intermittent movement, of | (1) a revolving carrier having an intermittent movement, of |
| (2) a central driving gear, | (2) a central drive, |
| (3) a plurality of driving spindles having a stationary support and variable speed driving connections with said central driving gear, | (3) a plurality of driving spindles having a stationary support and variable speed driving connections with said central drive, |
| (4) a corresponding number of work-carrying spindles mounted in said carrier to revolve therewith around said driving spindles, | (4) a number of work-carrying spindles mounted in said carrier to revolve therewith around said driving spindles, |
| (5) gears for said work-carrying spindles, | (5) gears for said work-carrying spindles, |
| (6) variable speed driving connections between said driving spindles and said work-carrying spindles for operating the latter during the stationary periods of said carrier, | (6) driving connections between said driving spindles and said work-carrying spindles for operating the latter during the stationary periods of said carrier, |
| (7) the gears of said work-carrying spindles moving out of engagement with the gears of said driving spindles during the revolving movement of said carrier. | (7) the gears of said work-carrying spindles being operatively disconnected from the driving spindles during the indexing of the carrier. |

In the progress of these comparisons, it is difficult to avoid recurrence to the thought that back of Bullard's variations there is nothing but a purpose to narrow or enlarge verbal statement. That is to say, the language dealing with the identity of object precludes ascribing to the draftsman a purpose to disclose any variant basic concept; and the result is that the language, after all, while now comprehending a structural variation, still leaves the variant structure within easy comprehension of Conradson's language. Therefore, also, to the extent that this claim calls for discussion of matters arising on the previous claims, that is, the "variable speed," the "corresponding number," the "gears," elements or subelements, the discussion need not be repeated. But, again, on comparing the seventh element of this claim, it is somewhat burdensome to conceive any possible distinction between Conradson's *"gears"* which *"move out of engagement with* the gears of the driving spindles" and those of Bullard which may be "operatively disconnected" from "the driving spindles" which are driven *by gears*. In line with observa-

tions made on the other claims, nothing can be suggested, either upon the art, nor as between Conradson and defendant or Bullard —if these claims are new as combinations—that places upon Conradson a limitation because of a difference between "gears moving in or out of engagement" and "gears" susceptible of being "operatively disconnected." I assume the mechanical susceptibility of being "disconnected" *during* the *indexing* of the carrier is the same as Conradson's gears "moving in and out of engagement * * * during the revolving movement of the carrier."

Claims 5 and 68 of the patents, respectively, again disclose exact identity of language respecting the "revolving carrier," the "central driving gear" (though Bullard calls it a "central drive"), the plurality or "driving" and "work-carrying" spindles. They diverge in characterizing the mechanism for speed variation, thus:

| In Conradson, Claim 5, Element 5. | In Bullard, Claim 28, Element 5. |
|---|---|
| "gears of different sizes for said work carrying spindles and gears of different sizes for driving said driving spindles mounted to mesh with said central driving gear and with the gears of said work-carrying spindles for operating any one of said work-carrying spindles or any group of said spindles at the same or variable speeds, or allowing any one of said work carrying spindles or any group of said spindles to remain stationary during the revolution of said carrier." | "An operative connection between the driving spindles and the work carrying spindles, a change speed gearing operatively connecting the central drive with said driving spindles." |

And in amplification of their respective claims, the patentees continue with this further characterization, differing only in the italicized portions:

| Conradson | Bullard |
|---|---|
| "said work carrying spindles *passing out* of driving connection with said driving spindles, and being stationary on their own axes during the movement of the carrier." | "said work carrying spindles being *adapted to pass* out of driving connection with said driving spindles and being stationary on their own axes during the movement of the carrier." |

If we now entertain the view heretofore expressed, that Conradson's "gears" and Bullard's "operative connection" comprehend the same mechanical concept or expedient, it seems obvious that the statement of element 5 of these claims differs only in the number of words used; or, putting it more accurately, that Conradson added to his definition, or

elaborated it, by introducing general words giving slightly greater detail of structure, structural relationship, and of the *course of operation*. Bullard contented himself with general words of definition, such as "operative connection," "change-speed gearing operatively connecting the central drive." But that merely demonstrates that each comprehended the other. In no event can it be said that Bullard excluded either Conradson or any other variant comprehendable with his (Bullard's) language. Nor does it leave either his patent or defendant's machine open to the suggested differentiation, viz., that their structures do not disclose gears of *different* sizes, merely because, although different size gears are used to introduce changes of speed, they are not present *all* the time, nor *permanently* mounted as an integral nondetachable part of the mechanism *all the time*. It suffices, so it seems to me, if the structure, regardless of *permanency of mounting,* of the gears has (to use in substance Bullard's own language) the *adaptability* to pass the spindles in or out of driving connection, or, by use of gears, to change speed. There is nothing in Conradson which places upon his claim the notion of *permanency* of mounting of any or all gears; nor of requiring *difference* of sizes of gears, *all, permanently* mounted; and it is my judgment that defendant's machine, and Bullard's claim, are both responsive to Conradson's definition, notwithstanding a variation of detail to be found in either. The provision, by Bullard, as part of his machine equipment, of "change gears" is directed to the accomplishment, equivalently, of Conradson's "variable speed" by means of gears, of "different sizes." Therefore, as to both claims 68 and 69 of Bullard, their applicability to defendant's machine is not to be denied because *the* so-called "change speed gear connection" is not *"in the organization"* in the sense that every "gear" is at all times present. The "connection," as a change speed mechanism, is none the less there and *susceptible of use* just as Conradson contemplates. It is, to say the least, provisionally there and, as a variable speed means, capable of satisfying every test of plain equivalence.

Notwithstanding concession of validity in the art, there has been some suggestion of the anticipatory effect of the British patent to Thompson, especially in considering Conradson and Bullard's broad claims 3 and 66, respectively. That, however, emphasizes the thought that each of them must have considered that this idea of a variable speed fea-

ture was of basic importance in their organizations. Indeed, as has been noted, Bullard's assertion of the pronounced success of his machine in producing larger quantity and better quality must rest largely upon this feature and neither could, or would, feel anything but astonishment on having their respective structures read out of the field of novelty because of Thompson. That is to say, each could well insist that their disclosures as a whole introduced into these broader claims, as implicit therein, such a basic novel element for variable speed, neither of the parties, nor Thompson, would regard these broader claims as intending to state their accomplishment as freed from the novelty found in the enumeration of combination elements, for example, of claim 1. The Thompson patent is no worse for Conradson than for Bullard as identical claimants; and, with a concession of validity, the court, as has been noted, may well accept such concession as reflecting everything that may be reasonably referred to the minds of these two rivals in their specifications of the dominant phases of their structures.

What is thus concluded upon claims 5 and 68, and upon some of the other claims, dispenses with extended comparison of claims 6 and 69 of the two patents. The variation of statement, in Conradson's elements of "gears," and "transmission gears of different sizes," and Bullard's "operative connection," "change speed *gear* connections," "means for *mounting* said operative connections," are deemed to be merely verbal, though very evidently aimed to fit with some greater particularity a structure, which, though variant, is plainly equivalent. As heretofore observed, a translation of one method of gearing, concede it to be gearing of *"different* sizes," into a series accomplishing exactly the same thing but which upon appropriate intermating compensates, mechanically, for the difference in *sizes* of the former, is not effective to take the variant out of the range of equivalence. It is my judgment that claims 6 and 69 are identical.

Claim 7 of Conradson and 70 of Bullard are identical, except that the latter, in calling for the element "corresponding number of work-carrying spindles geared," etc., leaves out the qualifier, "corresponding"; and the claims are therefore disposed of on the view expressed with respect to the same variation found in claims 3 and 66, and 4 and 67.

There remain four claims, 29, 30, 31, and 32 of Conradson, 72, 73, 74, and 75 of Bullard. They are identical except in respect of an element—a "stop" its "mounting," and operation. That the two patentees intended to incorporate an element aimed at limitation of downward movement of a tool carrier is evident (1) from the identity of these four claims in every other respect; and (2) from the language used in stating the "stop" element. Thus,

| In Conradson 30 | In Bullard 73 |
| --- | --- |
| (4) a guide column *for said reciprocating tool carrier.* | (4) a guide column for said reciprocating tool carrier. |
| (5) a stop *on said column* in the path of said tool carrier for. *positively* limiting the movement thereof toward said work-carrier. | (5) a stop in the path of said tool carrier for limiting the movement thereof toward the work carrier, *a reversing mechanism cooperating with said stop.* |

By characterizing this group of four claims as identical in all other respects, we are mindful that in some of them Bullard added other elements such as a "reversing" mechanism or a "controller unit," which, on familiar principles, cannot be of pertinency if Bullard's claims otherwise incorporate Conradson's combination. Now when Bullard incorporated into his structure the idea of divisibility of his tool carrying mechanism, it at once became impossible to exactly copy, or carry into it, Conradson's stop which *he* designed for *his* undivided carrier. Therefore, if the conclusion heretofore reached that Bullard did not differentiate from Conradson by mere division of the carrier is correct, it would seem fair to conclude that he did not differentiate by incorporating the conceived necessary incidents of separate "stops." Carrying the thought further, when it now appears that there was identity of purpose—a purpose inherently necessary in both structures—the case ought not to depend upon the precision with which the adjective or qualifier, "positive," is defined, or whether (as we considered the matter of gears) there was precision of "mounting," in these claims "on said column." If, however, we go beyond the face of the claims, the proofs demonstrate beyond the possibility of cavil that Bullard expressly asserted the "stop" of his claims, and the defendant's machine, to be "positive," in the sense that it functioned to "limit the movement," the identical movement, referred to by Conradson, and *required by the very law of both structures.*

The patents and the defendant's machine have the idea of "limiting downward movement" of the carrier, and plainly the expedient for doing it is a "stop." That "stop," whether called "normally stationary,"

"adjustable," must function to "limit" movement. Whether it be "positive" is quite immaterial if the *requisite degree* of limitation is not basically different in the two structures. There is no suggestion that the kind or degree of limitation of movement in Bullard is substantially unlike to Conradson; and, as noted, the fact that in Bullard and in defendant's machine the "stop" may function beyond the limitation of the downward movement co-operating with a reversing mechanism merely adds to but does not avoid Conradson's element.

It may be observed that these four claims should not be considered as covering merely the "stop" mechanism. Probably, if that were their entire purpose, and if nothing more were involved in this suit, they might be recognized as age-old. But the element is introduced by both parties with other elements which in turn are tied up to other concededly basic claims. Very likely if such basic claims be held valid, the defendant will feel that the stop element of these four claims is an insignificant remnant; and were such basic claims held invalid, the plaintiff would probably make little effort to rescue the stop element. If, therefore, the combinations of these four claims be recognized as having an adjunctive status, dominated by and a part of the larger and real combinations of other claims, they ought to be and are recognized to that extent, if no further. That being so, the defendant's machine infringes.

The discussion of these claims, their comparison, and their application to defendant's machine, leads to this summary:

(1) That the corresponding claims of the two patents are either identical or that the language of each comprehends the structure of the other.

(2) That no variant of Bullard or of defendant's machine—in respect of any element—can fairly be excluded from Conradson as embodying a different basic concept or a nonequivalent structural element.

(3) That when the claims in question are recognized as valid on the art, then those which, by their express language are deemed the broadest, are not to be denied applicability, as between these parties, because their language may not expressly include an element or elements which Conradson and Bullard on their respective specifications and their other claims, both show to be vitally inherent in their larger novel purpose. Concretely this has reference to claims such as Conradson's 3 and 7 in their omission to incorporate by express words the variable speed element. And there can be no ground of complaint, as between plaintiff and defendant or Bullard, in recognizing, on the art, the breadth of each claim, though the ultimate right is awarded to Conradson. Stating it still another way, if Bullard or the defendant could justly insist that Bullard's claims 66 and 70 were entitled to a generous signification and implication—as, for example, against Thompson—then, as between Conradson and Bullard or the defendant, Conradson's position is just as good. And it follows that, in such situation, the right not only is to be recognized as broad, but as entitled to liberality in its application and enforcement.

■ There remains for consideration the contention that between Conradson and Bullard, the latter was prior in conception and diligent perfection of the invention. The testimony on this branch of the case must be examined in its relation to the dates, viz.: That Bullard applied for his patent January 9, 1914; the patent issued March 5, 1918, or four years later; Conradson applied March 30, 1914, his patent issued May 18, 1915, or approximately fourteen months after application. The defendant urges upon the testimony: (1) That Bullard is shown to have conceived the invention in June, 1913, about seven months before filing; (2) that although the proofs may show that Conradson completed a machine prior to Bullard's filing, yet "regardless of any question of inventive ingenuity, Bullard and Stevens, in the Summer of 1913, were in possession of an organized concept embodying the first four elements of claim one of the patent in suit *in combination with independent* tool slides; and the entire combination of claim three except the idea of *rolling the work spindle gears into* mesh with the driving spindles located at their respective stations; and with the further exception of the idea of using a number of driving spindles *corresponding in number* with the number of work spindle gears, both of which features are absent from the defendant's machine." (Italics supplied. Defendant's brief.)

Again: "It follows that before Plaintiff can prevail in its charge that the combination shown in the Bullard and Stevens 1913 drawings is within the terms of any claim of the patent in suit and infringement thereof, the plaintiff must establish that Conradson had a *still earlier* conception of an invention of sufficient scope to include the

combination shown in the earlier 1913 drawings."

As noted in the first part of this discussion, Conradson in May, 1912, had a conception of some sort of a new machine. He then entered into a contract with Giddings & Lewis Manufacturing Company for its manufacture and erection; and he then, and from time to time thereafter, gave to the manufacturer what he prepared, viz., drawings, patterns, and other guides necessary to carry on the project. He, in his early correspondence, called his structure a "multiple spindle machine"; the manufacturer, a "multi-turning machine."

The proofs, bearing pertinently upon this phase of the case, may be considered along rather clearly defined lines. When we look to letters written, sketches or photographs made, descriptive printed matter within the dates, May, 1912, and January, 1914, there is quite a field, as to both Conradson and Bullard, for conjectural possibilities respecting the probative force or value of any particular item of proof. That is particularly true when, as defendant persists—erroneously as I believe—that in a course of endeavor by rivals, the probative force of proof of their respective acts, at any one time, must be subjected to the test of a particular formal claim of a patent, prepared and filed much later. Thus, if we try illustratively to apply this thought and direct attention to June, 1913, when Bullard claims to have conceived the claims now in question, his supporting proof is said to be found in a sketch or drawing made at that time. The countervailing proofs respecting Conradson's earlier conception are to be found, if at all, in the extensive chronology of his activity beginning in May, 1912. And on his behalf there has been introduced a correspondence file of approximately one hundred and sixty pages, beginning at the latter date and ending late in the year 1913, or early in 1914, which, as correspondence, reflects, as a summary of facts and of the character of relationship with Giddings, the following:

(1) That Conradson, in May, 1912, entered into an agreement with Giddings & Lewis Manufacturing Company for the manufacture of a "multiple spindle" hydraulically actuated, which he declared he had invented. That he then claimed to have "invented" a multiple spindle and a single spindle "lathe" or machine, both "automatic," is not open to doubt. The engagement between them clearly discloses Conradson's purpose to develop his inventions commercially, and, in consideration of the manufacturer's contribution of capital and the work of manufacture, to assign patents to a trustee, with exclusive license to, and sharing of profits by, such manufacturer.

(2) That Conradson forthwith, upon acceptance of his proposal, sent to the manufacturer drawings, tracings, patterns, parts, and the like, then asserted to disclose the subject-matter of his invention and requisite to carry out the engagement.

(3) That the manufacturer, without doubt, understood, acted upon, and proceeded with the work upon what Conradson had thus given him, as adequate in its disclosure of the asserted invention. Without doubt drawings and the patterns and parts were received by the manufacturers, on or prior to June 6, 1912, when they were acknowledged.

(4) From the inception of this relationship, the correspondence covers a wide range of communication by each to the other of development of detail, of communication with others respecting manufacture of parts more properly to be committed to specialists in manufacture thereof; and it shows, not only diligent but unremitting attention, by both parties down to approximately December 29, 1912, when the manufacturer had prosecuted his work—whatever it was—to the point of assembly to permit photographs to be taken. Such photographs were transmitted in February following to a trade publication, "Machinery," and, with descriptive literature, reproduced therein in the September, 1913, issue. The proofs upon this are not open to question.

(5) That the correspondence, down to the point now reached, December 31, 1912, demonstrates beyond possibility of fair controversy that the parties were communicating with respect to the identical matter, viz., an asserted invention by Conradson, the subject of the May, 1912, engagement, and were committing themselves to the basic disclosure made by the inventor to the manufacturer. And it may be said that the correspondence shows this (1) by what it contains and (2) by the absence of anything to indicate any *basic* divergence from what had been initially transmitted by Conradson to the manufacturer and upon which the latter proceeded with the work. That is to say, the record thus furnished forbids the suggestion that the work, as it was on December 31, 1912, was not what both parties had contemplated, and which *was required*, as an embodiment of the conception transmitted

by Conradson; or that the manufacturer, when communicating with Conradson late in December, was not ascribing "success" to the thing for whose manufacture Conradson had engaged him in May.

(6) That in the period just considered (and I believe it to be true of the later period) the work committed to Giddings was not prosecuted with, nor attended by, efforts at secrecy. On the contrary, the proofs show that in certain respects quite full disclosure must have been made, to others, of the general scheme or design of the contemplated machine. But of great importance is the showing that the construction work, long prior to December, 1912, was open to and in fact known to and participated in by one Marshall who was in a relationship with Bullard. The correspondence shows clearly that Conradson apprised him and apparently consulted him in respect of features of the "machine" in course of construction at the Giddings and Lewis plant.

(7) That in January, 1913, the manufacturer declared by letter to Conradson that the "new machine tool" was 90 per cent. complete. That this was the "machine"—a six "spindle"—in course of erection during the preceding seven or eight months, the subject of the photographs, is not open to doubt, nor even to conjecture. That is to say, no claim can be made that it was another type, "single spindle," which was also within the Giddings and Lewis contract. The latter, as appears from Conradson's letter of January 29, 1913, had not even been completed *in design*, until then, and had not been undertaken in the factory. The fact of 90 per cent. completion *at that time* was reiterated in the testimony of the writer of the letter (Cleveland) referred to.

(8) That from January, 1913, to October, or at the latest December, 1913, the manufacturer, as shown by the correspondence, was committed to perfection of detail—doubtless much of it—in the identical machine assembled, and photographed in December, 1912. If the correspondence is receivable here—it usually is in patent cases—as competently proving facts therein recited, it is my judgment that it leaves no doubt respecting the *continuity* of the attentiveness by Conradson, by the manufacturer, and by others, who had been apparently openly apprised of the project, to the perfection in detail of what had been accomplished, as noted, up to December, 1912. True, the correspondence discloses delays, some of them protracted, and the causes thereof; but equally plainly does it disclose, early in 1913,

the good faith confidence in the approaching completion of the work for purposes of test or demonstration, in the hope of answering and satisfying commercial inquiry and prospects. I think the proof establishes the completion of the machine, as a real "reduction," at some time prior to a demonstration which took place in December, 1913. And regardless of how they might be considered if taken severally, each one alone, the announcement by the manufacturer in January, 1914, his characterization of the machine, the concurrent preparation of patent papers, the actual building, sale, and continued operation of machines, are deemed to be persuasive when considered as a culmination of that which started in May, 1912. Upon this summary, if a like summary were made of the proofs respecting Bullard's activities, it may be reiterated that it might be difficult to apply the formal language of later patent claims to any particular item of evidence at any particular time. Therefore, if it be urged that the photographs of Conradson, made in December, 1912, sent in February, 1913, to "Machinery," and published in its September, 1913, issue, do not disclose with precision every element of each of the claims in question, it may be answered that the law does not require that degree of exactness in proving conception of an invention. Probably no one would claim that Bullard's sketches of June, 1913, standing alone could meet that test. But the question whether prior to June, 1913, Conradson had a concept of an automatic multiple spindle machine embodying the *novel combinations* which subsequently became the subject of these patent claims is answerable in this lawsuit upon the quality of the things said and done in sequence, and the estimate properly to be placed upon them at the critical date of rivalry with Bullard.

In answering the question last above propounded, it is not necessary to pursue a suggestion that Conradson's ideas, prior to June, 1913, had in fact been transmitted to Bullard; nor to pursue further an inquiry for reasons why Bullard should have copied the Conradson claims. It is, however, difficult to eliminate the inquiry how Bullard, without knowledge of Conradson's development, could have hit upon a construction or organization of variant elements or modifications without a clear conception of Conradson's broader concept. I am satisfied upon the proofs that as early as December, 1912, Conradson not only had the conception found in these conflicting claims of the two patents, but that he had perfected its develop-

ment substantially as is claimed on his behalf. If, however, the early proofs, correspondence, photographs, and other exhibits which bear pertinently upon his work down to that time, are to be criticized as lacking in particularity, it is my judgment that almost conclusive corroboration comes from the defense in this case. If it be assumed that Bullard conceived in June, 1913, when he made his drawing, then his recognition of the reproduction of Conradson's photographs of December, 1912, as a disclosure of his (Bullard's) identical concept, dispenses with the necessity of any further proof supportive of Conradson's claim as the earlier conceiver. In my judgment, Bullard's testimony is, in effect, that he recognized in Conradson's ("Machinery") the very concept which he (Bullard) was then working out. And as there is no suggestion in the case that Conradson may have borrowed from Bullard, Conradson is entitled to the award as of the earlier date, that is to say, approximately, December, 1912. The conclusion, therefore, is that both upon the issue of conception and diligence in reduction, Conradson is entitled to priority.

On these views the plaintiff is entitled to a decree.